UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
ASHLAND

CIVIL ACTION NO. 11-36-EBA

TERESA JUNE BRYANT                                                          PLAINTIFFS,
and DAVID M. BRYANT,

V.                                    **OPINION AND ORDER**

KING'S DAUGHTER MEDICAL CENTER
and DR. MARIANO FARESI,                                                     DEFENDANTS.

\* \* \* \* \* \* \*

This matter is before the Court on Defendants' Motion for Summary Judgment. [R. 51].

Fully briefed, the matter is ripe for review. Because Plaintiffs have not set forth a genuine issue of

material fact, Defendants' motion for summary judgment is GRANTED.

FACTUAL BACKGROUND

On April 16, 2010, Plaintiff Teresa June Bryant underwent the surgical repair of an

abdominal hernia under the care of Dr. Mariano Faresi at King's Daughter Medical Center

(hereinafter "KDMC"). [Record No. 1, at 2]. After the procedure, two draining tubes, Jackson-Pratt

drains, were placed into Ms. Bryant's mid-section, one in her right side and one in her left. [Record

No. 52-3, at 40-41]. The right drain was removed on April 18, 2010. [Id. at 40: 20-24-41:1-14]. After

her discharge from the hospital on April 21, 2010 [Record No. 54-7], Ms. Bryant returned to Dr.

Faresi's office a week later, on April 28, 2010. [Record No. 1, at 3]. She was then taken to

emergency surgery and later discharged. [Id.].Thereafter, Plaintiff underwent a further procedure

on May 29, 2010 and was discharged on June 1, 2010. [Id. at 2-3]. The left drain was removed on

July 9, 2010. [Record No. 52-2, at 41:15]. By July 21, 2010, her condition had continued to

deteriorate. At this time she was bleeding from the mouth and rectum and was life-flighted to Riverside Methodist Hospital in Columbus, Ohio. [Id.]. There, she underwent endoscopic laser surgery sealing certain damaged blood vessels in the stomach. [Id.].

Teresa Bryant and her husband initiated this cause of action against Dr. Faresi and KDMC in April of 2011. [Record No. 1]. According to the Bryants' complaint, Mrs. Bryant's hernia surgery and her follow-up care at KDMC were provided negligently, which caused the development of necrotic tissue and infection at the surgical wound sight and ultimately resulted in the need for multiple additional surgeries, among other emotional, physical, and monetary costs. [*See* Id]. The Bryants also contend that Teresa Bryant injured her back due to a fall which occurred as a result of KDMC's nurses' negligence.[ Record No. 52-2, at 102:5; *See* Record No. 53.].

Since filing, the case has proceeded in accordance with Court imposed scheduling deadlines. Fact discovery concluded on March 1, 2012, with an expert discovery deadline of October 1, 2012. [Record No. 22]. Defendants filed the instant motion for summary judgment on October 3, 2012. [Record No. 51]. As grounds, Defendants contend Plaintiffs' medical negligence claims fail as a matter of law because Plaintiffs' expert disclosures [Record No. 45] failed to comport with FEDERAL RULE OF CIVIL PROCEDURE 26.[1] According to Defendants, this effectively precludes Plaintiffs' expert witnesses, Dr. Tenpenny and Dr. Fleming, from testifying as to their expert opinion.[Record No. 51, at 3]. Defendants assert that without Dr. Tenpenny or Dr. Fleming testifying as experts, Plaintiffs cannot establish the applicable standard of care, related breach of that standard, or the

---

[1]Defendants point out that Plaintiffs' expert disclosure included only the following information: Plaintiffs hereby notify this Court and defense counsel that Plaintiffs are designating the following medical experts to testify and render opinions as follows: Dr. Teresa Tenpenny, Dr. James Fleming and Defendant, Dr. Mariano Faresi, as on cross-examination. [Record No 45].

cause of Ms. Bryant's injuries as required by Kentucky law in medical negligence claims. [Id.].

In response to Defendants' motion, the Bryants concede that neither Dr. Tenpenny nor Dr. Fleming are offered as expert witnesses on the issue of "deviation from the standard of care" by Dr. Faresi and KDMC. [Record No. 53, at 1]. Instead, these witnesses will testify as to the treatment they personally rendered to Mrs. Bryant, their opinion inherent in the medical records previously provided to Defendants' counsel. [Id]. The Bryants assert that Dr. Faresi, who was designated in Plaintiffs expert disclosures "as on cross-examination" [Record No. 45], provided the requisite expert testimony on standard of care, breach, and causation of Ms. Bryant's injuries in his deposition conducted by the Plaintiffs on January 18, 2012. [Record No. 53, at 1]. And, in the alternative, "circumstantial evidence can be used to create a jury issue regarding causation associated with Teresa Bryant's medical injuries following her surgery on April 16, 2011." [Id. at 11]. The Bryants then enumerate five (5) specific deviations from the standard of care for which Dr. Faresi's deposition and/or circumstantial evidence establish the requisite support for Plaintiff's claims to succeed as a matter of law, and which thus, must be submitted to a jury:

> (I) Negligence occurred when a nurse, without ever checking with Dr. Faresi, removed the right Jackson Pratt drain, resulting in a build-up of fluid, probable infection and the ripping open of the incision due to the build up of excessive amounts of fluid that could not drain.

> (II) The incision care by the nurses and Dr. Faresi was substandard and resulted in excessive build-up of fluid and infection, thus a rupture of the incision cite and need for additional surgery.

> (III) Nurses of KDMC negligently refused to help Teresa walk to the commode, and as a result Teresa fell, re-injuring her back.

> (IV) Doctors of KDMC negligently placed Teresa on the antibiotic, Vancomyocin, by mistakenly placing her on a dosage that was more than double the required amount. As a result of that mistake, she suffered renal failure and damage to her kidneys.

> (V) Doctors of KDMC negligently placed Teresa on Coumadin, by mistakenly placing her

on a dose that was beyond the standard of care and resulted in her bleeding profusely, both rectally and from the mouth. As a result, she was life flighted to Riverside Hospital in Columbus, Ohio for emergency surgery that saved her life.

[*See* Record No. 53, at 2-3]. In conclusion, Plaintiffs request a charge on spoilation and postulate that the issue of Dr. Faresi's credibility[2], which is in the sole discretion of the jury, provides the basis for denying Defendants' motion for summary judgment. [Id. at 8; Id. at 31].

In reply, Defendants contend Plaintiffs still cannot present the requisite expert testimony to survive summary judgment as a matter of law. [Record No. 54, at 2]. According to Defendants, Dr. Faresi's deposition testimony is inadequate to provide the standard of care, breach of that standard, or the causation of the Bryants' alleged injuries. Defendants further assert that circumstantial evidence cannot be used to prove causation in this medical negligence case. In close, Defendants contend Plaintiffs' spoilation and credibility arguments have no bearing on the pending motion for summary judgment. [Id. at 13].

For the reasons discussed below, the Court will grant Defendants' pending motion for summary judgment.

## SUMMARY JUDGMENT STANDARD

When sitting in diversity, a federal court applies the substantive law of the state in which it sits. Hayes v. Equitable Energy Resourcs Co., 266 F.3d 560, 566 (6th Cir. 2001) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941)). When considering the issue of summary judgment, however, a federal court applies the standards of FEDERAL RULE OF CIVIL PROCEDURE 56 rather than "Kentucky's summary judgment standard as expressed in Steelvest, Inc. v. Scansteel

---

[2]According to the Bryants, "there are as many as three to five missing records regarding office visits of Teresa and David with Dr. Faresi between the date of discharge around April 18th and the day before the second surgery (April 27th)" in which Teresa visited Dr Faresi complaining of her leaking wound. [Record No. 53, at 8]. These records, according to Plaintiffs, "no longer exist in the medical records,"but are important to their claim. [Id.].

Serv. Ctr. Inc., 807 S.W.2d 476 (Ky. 1991)." Gafford v. Gen. Elec. Co.,997K F.2d 150, 165 (6th Cir. 1993). Pursuant to Fed.R.Civ.P. 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

The party moving for summary judgment bears the initial responsibility of informing the Court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Id. The Court will then view all facts in the light most favorable to the non-moving party, giving him or her the benefit of all reasonable inferences that can be drawn from the facts. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Importantly, however, not every issue of fact necessitates the denial of a summary judgment motion. Id. at 248. The test for deciding a motion for summary judgment is essentially the same as that for a directed verdict motion. Id. at 252; Street v. J.C. Bradford & Co., 886 F.2d 1472, 1477 (6th Cir. 1989). There is no issue for trial, and a motion for summary judgment should be granted, unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict in the nonmoving party's favor. Anderson, 477 U.S. at 251; Street, 886 F.2d at 1478.

To successfully defeat a motion for summary judgment, the non-moving party must come forward with "specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). In other words, "the nonmoving party must present 'significant probative evidence' to show that 'there is [more than] some metaphysical doubt as to the material facts.'" Dixon v. Gonzales, 2007 WL 750532 (6th Cir. 2007) (citing Moore v. Phillip Morris Cos., 8 F.3d 335, 339-40 (6th Cir. 1993)). If the record, taken as a whole, cannot

5

lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial, and summary judgment is appropriate. Matsushita, 475 U.S. at 586-87. Notably, the trial court is not required to "search the entire record to establish that it is bereft of a genuine issue of material fact." Street, 886 F.2d at 1479-80. "The nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." In re Morris, 260 F.3d 654, 665 (6th Cir. 2001).

## ANALYSIS

To successfully prove medical negligence as a matter of law in Kentucky, the plaintiff must prove the elements of negligence by medical or other expert testimony. Harmon v. Rust, 420 S.W.2d 563, 564 (Ky. 1967); Blankenship v. Collier, 302 S.W.3d 665, 667 (Ky. 2010); *see also* Rogers v. Integrity Healthcare Serv., Inc., 358 S.W.3d 507, 511 (Ky. App. 2012). In other words, the Plaintiff must establish that the treatment given fell below the degree of care and skill expected of a reasonably competent practitioner of the same class and under similar circumstances, and that the negligence proximately caused the alleged injury or death. Hyman & Armstrong, P.S.C.   v. Gunderson, 279 S.W.3d 93, 113 (Ky. 2008) (citing Reams v. Stutler, 642 S.W.2d 586 (Ky. 1982); .Grubbs ex rel. Grubbs v. Barbourville Family Health Ctr., P.S.C., 120 S.W.3d 682 (Ky. 2003); Mitchell v. Hadl, 816 S.W.2d 183, 185 (Ky. 1991); Cordle v. Merck & Co., Inc., 405 F. Supp. 2d 800 (E.D. Ky. 2005)).

There are two exceptions to this general rule. First, expert testimony on causation is not required when a layperson can "conclude from common experience" that the injury in question does not occur when the proper procedures are followed (*res ipsa loquitur*). Perkins v. Hausladen, 828 S.W.2d 652, 655 (Ky. 1992). Second, expert testimony is not required if the defendant physician

makes admissions "of a technical character" that show he did not meet the standard of care. *See* Id. (internal quotation marks omitted); *see also* Blankenship, 302 S.W.3d at 670. Absent these limited exceptions, however,"the causal connection between an accident and an injury must be shown by medical testimony and the testimony must be that the causation is probable and not merely possible." Lacefield v. L.G. Elecs., Inc., Civil Action No. 3:6-12-KKC, 2008 LEXIS 14510 at *8 ( (E.D.K.Y. 2008) (*quoting* Jarboe v. Harting, 397 S.W.2d 775, 778 (Ky.1965)).

When analyzing evidence of causation,"[s]ubstance should prevail over form and that the total meaning, rather than a word-by-word construction, should be the focus of the inquiry."Lacefield, 2008 LEXIS 14510 at *8 (*quoting* Baylis v. Lourdes Hosp., Inc., 805 S.W.2d 122, 124 (Ky.1991)). "[T]he intent of the law is that if a physician cannot form an opinion with sufficient certainty so as to make a medical judgment, neither can a jury use that information to reach a decision." Combs v. Stortz, 276 S.W.3d 282, 296 (Ky. Ct. App. 2008) (citations omitted).

Each of Plaintiffs' alleged deviations from the standard of care will be addressed individually below, as the analysis rests on whether specific deposition testimony of Dr. Faresi and/or the common knowledge of lay jurors establishes the requisite standard of care, breach, and causation for each individual claim. As each claim cannot succeed without establishing every element of negligence, if a claim fails on one element, failure to analyze the other elements does not signal that Plaintiffs have met their burden on these elements. For ease of reference, the claims are assigned as claims I-V.

Claim I. Negligence occurred when a nurse, without ever checking with Dr. Faresi, pulled the right Jackson Pratt drain, resulting in a build-up of fluid, probable infection and the ripping open of the incision due to the build up of excessive amounts of fluid that could not drain.

In claim I, Plaintiffs contend the removal of Mrs. Bryant's right Jackson Pratt caused the

other Jackson Pratt drain located in her left side to become clogged. [Record No. 53, at 18]. This resulting, compounded lack of drainage then caused two injuries: (1) the accumulation of fluid and eventual burst of Mrs. Bryant's incision site; and (2) infection at her incision site. [Id. at 19]. To succeed on claim I, the Bryants must establish the applicable standard of care medical professionals employ when removing Jackson-Pratt drains, that the care provided to Ms. Bryant fell below the degree of care expected of a reasonably competent medical professional of the same class under similar circumstances, and that this breach proximately caused her injuries. *See* Hyman, 279 S.W.3d at 114. Claim I fails as a matter of law because Plaintiffs have not set forth sufficient evidence on which a jury could find that the removal of Ms. Bryant's right Jackson-Pratt drain caused the build-up of fluid and eventual burst of her incision site or that Mrs. Bryant suffered from an infection, as alleged.

<u>Injury 1: Fluid accumulation and incision rip.</u>

Contrary to Plaintiffs' contention, Dr. Faresi's deposition testimony does not satifsy Plaintiffs' burden of providing evidence which a jury could rely upon to find that the removal of Mrs. Bryant's right Jackson-Pratt drain "probably" caused her fluid accumulation and resulting incision site rip. *See* Jarboe, 397 S.W.2d at 778. This conclusion is apparent from reading the entirety of Dr. Faresi's deposition testimony. Even though Dr. Faresi indicated that the left Jackson-Pratt drain, "...was not working" on April 27, 2010, he never testified to a causal link between the removal of the right drain to the failure of the left. [Record No. 52-3, at 126-128]. In addition, while Dr. Faresi indicated that having only one drain was , "not the preferred way" of draining in Mrs. Bryant's situation, he quickly corrected Plaintiffs' attorney's statement that "...the left drain would not drain the right adequately and the left drain would not drain the left side adequately." [Id. at

85:17-24]. According to Dr. Faresi, " [n]o...one drain can drain fluid from the other side." [Id. at

85:20-21]. He also indicated that fluid accumulation is a risk factor when a Jackson-Pratt drain is

removed too soon. [Id. at 24:1-4]. But, when specifically asked why Mrs. Bryant had a problem with

fluid build-up, Dr. Faresi revealed that there were several other reasons she suffered from fluid

build-up and resulting complications. He did not list the removal of the Jackson-Pratt drain:

> Q. Why has she gone through the multiplicity of surgeries and drain problems and fluid
> buildup and inflammation and pain and the debridements and the necrotic tissue and purulent
> drainage? What happened? Why?
>
>  A: Unfortunately, after my operative procedure, she suffered from a complication.
>
> Q: Anything further? Do you know what the complication was?
>
> A: Yes.
>
> Q: What?
>
> A: Skin necrosis and wound necrosis.
>
> Q: Do you know why that occurred?
>
> A: There are several factors that may have played a role in this.
>
> Q: Please, list all of them that you can for me.
>
> A: The surgical technique. The component separate involves the raise of flaps, and that
> technicum devascularized the skin to a certain level which is, in most patients, tolerable.
> Unfortunately, her skin did not tolerate that.
>
> Q: Okay. What else could explain all of these complications?
>
> A: She has a very thick subcutaneous tissue layer related to her obesity. She came to me with
> a very high body mass index, which put her at a very high risk for complications, including
> necrosis and infection.
>
> Q: Okay. Anything else?
>
> A: No.

[Id. at 139-141]. When compared to cases where Kentucky courts have analyzed the sufficiency of expert testimony on the element of causation, it cannot be found that the substance of Dr. Faresi's testimony meets the Plaintiffs' threshold burden here. In Lacefield v. LG Electronics, Inc, a plaintiff complained that a loud cell phone ring had caused tinnitus, or ringing in the ear. 2008 U.S. Dist. LEXIS 14510. Here, the federal district court sitting in diversity and applying Kentucky law, examined a medical expert's flat statement that the cell phone was the "most likely reason" for the tinnitus, but that without further "questioning or research" he was unable to say it was a medical probability that the cell phone caused the hearing loss. Id. at 11. This was not enough to meet Kentucky's causation burden. According to the Lacefield court, "a juror could not infer on the basis of the expert's testimony that the cell phone ringing more than likely caused the Plaintiff's hearing loss in his left ear." Id. In Baylis v. Lourdes Hosp., Inc., the Supreme Court of Kentucky found that causation had been sufficiently established when a physician expert witness straightforwardly testified "my opinion is that a bad mistake was made... There is just no excuse for giving a patient in the same emergency room in the same hospital the same drug that made her allergic before, because there is a danger of almost killing her and it almost did." 805 S.W.2d 122, 126 (Ky. 1991). As opposed to the testimony in Baylis, Dr. Faresi's deposition testimony never links the removal of Mrs. Bryant's right Jackson-Pratt drain to the complications which resulted in her left Jackson Pratt drain or at her incision site. In fact, when listing the causes of Mrs. Bryant's fluid accumulation and related complications, Dr. Faresi lists several other reasons and complicating factors, but makes no mention of the removal of her right Jackson-Pratt drain. Accordingly, it cannot be found that his deposition testimony provides the jury with sufficient evidence to find that the removal of this drain more than likely caused Mrs. Bryant's fluid build up. As Dr. Faresi is the only expert on which

Plaintiffs rely to establish causation here, Plaintiffs cannot meet their burden on causation.

Neither of the two exceptions which alleviate the need for medical expert testimony on causation rescue this claim. Dr. Faresi did not make any pertinent admission, and this injury is not a case for *res ipsa loquitur*. The recent Kentucky Court of Appeals case <u>Green v. Owensboro Medical HealthSystem, Inc</u>*., et. al.,* 231 S.W.3d 781 (Ky. App. 2007) is instructive on this conclusion. In <u>Green</u>, the Kentucky appellate court affirmed that while laymen are able to recognize the unusual result, they do not possess sufficient common knowledge about administering anesthesia to infer negligence when a patient enters the operating room for hand surgery with teeth intact and then emerges with "loose, misaligned, and bloody teeth." <u>Id</u>. 784-85. In reaching this decision, the court considered the plaintiff's multiple sclerosis and periodontal disease diagnoses, reasoning she was possibly "more prone to dental injury." <u>Id</u>. In the case at bar, we are faced with a result less unusual than that of <u>Green</u>, as Mrs. Bryant's injury occurred at the site of incision as opposed to an unrelated part of her body. As such, it logically follows that laymen do not commonly possess the knowledge about the expertise involved in the removal of draining tubes or the expertise involved in preventing fluid accumulation after a surgery. Considering that Mrs. Bryant's obesity and high body mass index possibly render her more prone to these complications, as Dr. Faresi indicated in his deposition [Record No. 52-3, at 139-41], it cannot reasonably be found that laymen possess the common knowledge to infer negligence on the removal of Mrs. Bryant's draining tube. Claim I regarding the build-up of fluid fails as a matter of law on the element of causation.

### Injury 2: Infection

Claim I regarding Mrs. Bryant's alleged infection fails as a matter of law because Dr. Faresi's deposition testimony does not satisfy Plaintiffs' burden of providing sufficient evidence on

which a jury could find that Mrs. Bryant suffered from an injury, namely any infection. Contrary to

Plaintiffs' contention, Dr. Faresi 's comments about the potential for infection do not establish that

Mrs. Bryant suffered from an infection. Dr. Faresi repeatedly denied, throughout his testimony, that

Mrs. Bryant ever suffered from an infection:

> Q: You don't think she had any infection?
>
> A: No.

[Record No. 52-3, at 47:5-6].

> Q: ...Are you saying she didn't have infection or you never recognized that she had
>
> infection?
>
> A: I'm saying she never had infection

[Id. at 122:6-8].

> Q: ...on April 28th, 2010, when Mrs. Bryant returned to you, did you think she had an
>
> infection at that point?
>
> A: No.

[Id. at 145: 13-16],

> Q; Okay. So wound necrosis and infection. You're saying that was a risk and may be what
>
> happened to her...
>
> A:...I didn't say infection.
>
> Q: Yeah, you said would necrosis. She had a --
>
> A: She had a risk for infection and necrosis. She had necrosis only.

[Id. at 140: 11-18].

> A: Wound infection doesn't cause the skin issues she had.

[Id. at 142: 17-18]. In view of this explicit testimony, the Court has no evidence, other than the non-expert claims of the Plaintiffs, that any infection occurred. Because Dr. Faresi is the only expert on which Plaintiffs rely to establish injury here, claim I regarding infection also fails as a matter of law.

Importantly, even if a question of fact existed regarding whether an infection did occur, this claim would also fail on the element of causation. Dr. Faresi's testimony never links the removal of Mrs. Bryant's right Jackson-Pratt drain to an infection. Finally, this claim is not a candidate for rescue via the common knowledge exception. It is well settled in Kentucky that the presence of infection following an operation or in an area under treatment is not prima facie evidence of negligence in a medical malpractice case. Harmon v. Rust, 420 S.W.2d at 564 (citing Stacy v. Williams, 253 Ky. 353 (Ky, 1934); See also Nalley v. Banis, 240 S.W.3d 658, 661 (Ky. App. 2007). Hence, the Plaintiffs have not even proven the presence of infection. But even if they had, negligence would not be presumed, and their claim would still fail for lack of sufficient evidence on causation.

Accordingly, Plaintiffs have not presented sufficient evidence on which a jury could find in their favor on claim I.  Summary judgment is appropriate.

Claim II.  The incision care by the nurses and Dr. Faresi was substandard and resulted in excessive build-up of fluid and infection, thus a rupture of the incision cite and need for additional surgery.

In claim II, Plaintiffs assert that the "deplorable" condition of Mrs. Bryant's hospital room coupled with Dr. Faresi's and KDMC nurses' care for Mrs. Bryant's incision site caused two injuries (1) the accumulation of fluid and eventual burst of Mrs. Bryant's incision site; and (2) infection at her incision site. [Record No. 53, at 20-27]. According to Plaintiffs, these injuries necessitated Mrs. Bryant's second surgery. [Id. at 26]. To succeed on claim II, the Bryants must establish the applicable standard to which medical professionals are held when providing post-operative incision

13

care, that the incision care provided to Mrs. Bryant fell below the degree of care expected of a reasonably competent medical professional of the same class under similar circumstances, and that this breach proximately caused Mrs. Bryant injuries. Hyman, 279 S.W.3d at 114. Claim II fails as a matter of law because Plaintiffs have not set forth sufficient evidence on which a jury could find that the post-operative incision care provided to Mrs. Bryant caused the excessive buildup of fluid, rupture of her incision site, and need for additional surgery or that Mrs. Bryant suffered from an infection, as alleged.

Injury 1: Fluid accumulation.

Just as in claim I, Dr. Faresi's deposition testimony does not serve to create a question of fact regarding whether care provided to Mrs. Bryant probably, as opposed to possibly, caused the build-up of fluid and resulting incision site rip. See Jarboe, 397 S.W.2d at 778. First of all, Dr. Faresi's testimony about incision care does not indicate that inadequate incision care leads to the accumulation of fluid:

> Q: I'm asking now just about incisions for the Jackson-Pratt drains. Are there similar concerns for wound care about Jackson-Pratt drains?
>
> A: Yes. We keep them covered.
>
> Q: And what is the risk of – if you had, say, for example, the Jackson-Pratt drain uncovered, what risk could that present to the operative site?
>
> A: It may lead to an infection.

[Record No. 52-3, at 25:4-11]. When asked if pain and swelling accompanies infection, Dr. Faresi answered, "sometimes."[Record No. 52-3, at 23: 9-11]. And he indicated affirmatively that an infection can potentially stem from fluid accumulation. [Id. 24:4-7]. Dr. Faresi's deposition, however, never presents anything more than *possibility* of fluid accumulation. Moreover, Dr. Faresi

14

never links the incision care provided to Mrs. Bryant to the fluid accumulation at her incision site. Just as in claim I, when listing the causes of Mrs. Bryant's fluid accumulation and related complications, he lists several other reasons and complications, but makes no mention of improper incision care. [Id. at 140-141].

This testimony does not rise to the standard required in Kentucky for the Plaintiffs to establish causation in terms of probability, as opposed to possibility. *See* Baylis, 805 S.W.2d 122, 126; Lacefield. 2008 U.S.Dist. LEXIS 14510; Jarboe, 397 S.W.2d 775. Put simply, Dr. Faresi does not opine that the incision care provided to Mrs. Bryant more likely than not caused fluid build up and the eventual rupture of her incision. There is no question of fact on this issue. Dr. Faresi is the only expert on which Plaintiffs rely to establish causation. Plaintiffs cannot meet their burden of proof.

This claim is not saved by either exception which would forgive Plaintiffs' need for expert testimony. As analyzed in claim I, a lay juror does not possess the common knowledge to understand the cause of fluid build up at an incision site after an incision into one's mid-section. *See* Green, 231 S.W.3d 781.

<u>Injury 2: Infection</u>

For the same reasons discussed above, the Plaintiffs present no question of fact regarding the existence of an infection, and the Defendants are entitled to summary judgment.

Claim III.  Nurses of KDMC negligently refused to help Teresa walk to the commode, and as a result Teresa fell, re-injuring her back.

In claim III, Plaintiffs claim nurses at KDMC negligently refused to help Teresa walk to the restroom after her surgery. According to Plaintiffs, because Mrs. Bryant did not have assistance walking to the bathroom, she slipped and fell, re-injuring her back. [Record No. 53, at 29-30]. To

meet their burden of proving claim III, the Bryants must establish the applicable standard of care which nurses must exercise to prevent patient falls, that the nursing care provided to Mrs. Bryant fell below the degree of care expected of a reasonably competent nurse of the same class under similar circumstances, and that this breach proximately caused her alleged back injuries. Contrary to Plaintiffs' contention, these elements must be proven through medical or otherwise expert testimony. *See* Milby v. United States, Civil Action No. 08-650-JBC, 2011 U.S. Dist. LEXIS 90845(W.D.K.Y. Aug. 15, 2011) (requiring expert testimony on the applicable standard of care to which a nurse should be held to prevent patient falls); *See also* Tapp v. Owensboro Med. Health Sys., 282 S.W.3d 336, 338 (Ky. Ct. App. 2009) (requiring expert testimony on the standard of care to be exercised by a nurse); Aull v. Osborne, Civil Action No. 4:07-cv-00016, 2009 U.S. Dist. LEXIS 2914 (W.D. Ky. Jan. 15, 2009).

Plaintiffs have not met their burden on even the first requirement here, failing to establish the standard of care to which reasonably competent nurses would be held to prevent patient falls under similar circumstances. Dr. Faresi's deposition, the only expert testimony upon which Plaintiffs rely to establish this standard, says nothing as to how a reasonably competent nurse should care for a patient in Mrs. Bryant's situation. In fact, Dr. Faresi explicitly declared, "I don't know the nurse's responsibilities. I'm a physician." [Record No. 52-3, at 60:2-3].

Moreover, even assuming that Plaintiffs had carried their burden on the elements of standard of care and deviation from that standard, claim III fails on the element of causation. Plaintiffs have presented no expert evidence which opines that Mrs. Bryant's alleged fall had any effect on the current state of her back. This failure to provide expert evidence is not saved by the common knowledge exception. The lay juror would not have common knowledge of the medical expertise

16

involved in diagnosing the cause of a back injury, especially considering Defendants' expert report which reveals Mrs. Bryant suffered from pre-existing degenerative disc disease and facet arthritis.[3] [*See* Record No. 54-3]. Accordingly, Plaintiffs have not presented sufficient evidence on which a jury could return a verdict in their favor, and claim III fails as a matter of law. Summary judgment is appropriate.

Claim IV. Doctors of KDMC negligently placed Teresa on the antibiotic, Vancomyocin, by mistakenly placing her on a dosage that was more than double the required amount. As a result of that mistake, she suffered renal failure and damage to her kidneys.

In claim IV, Plaintiffs claim doctors at KDMC negligently placed Mrs. Bryant on an overdose of the medication Vancomyocin. According to Plaintiffs, this overdose led to Mrs. Bryant's renal failure and damage to her kidneys. [Record No. 53, at 27-28]. Claim IV fails as a matter of law because Plaintiffs have not established the standard of care to be applied in the administration of Vancomyocin. Medical negligence cases require more be shown than mere injury by a drug. *See* Hyman, 279 S.W.3d at 114. The plaintiffs must prove that the treatment given fell below the degree of care and skill expected of a reasonably competent practitioner and that the negligence proximately caused the injury or death. *See* Id.

Dr. Faresi never indicated the standard of care for the administration of Vancomyocin. While Plaintiffs contend that Dr. Faresi established this standard when testifying as to the "therapeutic range of Vancomyocin," Dr. Faresi's testimony was inadequate to do so. According to Dr. Faresi, the therapeutic range of Vancomyicin is below 20. [Record No. 52-3, at 50:6]. He also reveals that Teresa Bryant had a Vancomyocin range of 49, more than double the "desired normal range for Vancomyocin content in the blood system."[Id. at 50:7-9]. There is no testimony, however,

---

[3] Plaintiffs have raised no objection to this expert report. Plaintiffs have acknowledged Mrs. Bryant had previous back problems. [Record No. 53, at 31].

indicating that a reasonably competent practitioner would not, using the degree of care expected in his or her capacity, administer Vancomyocin this way under similar circumstances.

As a medical expert, "the prescribing physician can take into account the propensities of the drug, as well as the susceptibilities of his patient. His is the task of weighing the benefits of any medication against its potential dangers. The choice he makes is an informed one, an individualized medical judgment bottomed on a knowledge of both patient and palliative." Hyman, 279 S.W.3d at 114. (*quoting* Larkin v. Pfizer, Inc., 153 S.W.3d 758, 763 (Ky. 2004)(citations omitted). The majority of courts, including Kentucky courts, reason that this judgment is so individualized, even the drug information included in the FDA-approved package insert and the Physician's Desk Reference, while relevant and useful to the prescribing physician's standard of care, does not provide the sole determinants of that standard. Hyman, 279 S.W.3d at 114. (citations omitted) This information "can only be analyzed in the context of the medical condition of the individual patient." Id. (citing  Spensieri v. Lasky, 723 N.E.2d 544, 548 (N.Y. 2009); Morlino v. Med. Ctr. of Ocean County, 706 A.2d 721, 30 (N.J. 1998)).

Dr. Faresi's statements that the administration of Vancomyocin here was "out of range" provide no more information than would be learned from an FDA-approved package insert or a Physician's Desk Reference. This testimony is wholly inadequate to establish a question of fact on the standard of care to which a physician would have been held in the individualized administration of Vancomyocin to Mrs. Bryant. As Dr. Faresi is the only expert on which Plaintiffs rely to establish the requisite standard of care for claim IV, a jury would not have sufficient evidence upon which to return a verdict in Plaintiffs' favor. Summary judgment is appropriate.

Claim V.  Doctors of KDMC negligently placed Teresa on Coumadin, by mistakenly placing  her on a dose that was beyond the standard of care and resulted in her bleeding profusely, both rectally

18

and from the mouth. As a result, she was life flighted to Riverside Hospital in Columbus, Ohio for emergency surgery that saved her life.

In claim V, Plaintiffs assert that doctors at KDMC deviated from the standard of care by giving Mrs. Bryant an "overdose level of Coumadin." [Record No. 53, at 7, 28-29]. According to Plaintiffs, this amount of Coumadin caused Mrs. Bryant to bleed excessively from her abdominal wound. This gross bleeding caused Mrs. Bryant to undergo a third surgery in May of 2010. After the May 2010 surgery, Dr. Faresi installed a wound vac, a specialty device for open wound care. [Id. at 91:1-10]. According to Plaintiffs, after installation of the wound vac, Mrs. Bryant would see Dr. Faresi regularly, but he would never remove the wound vac. [Record No. 53, at 8].  Plaintiffs assert that by July 21, 2010, Mrs. Bryant  was in such poor condition that she had blood coming from her mouth and rectum, and had to be life-flighted to Riverside Methodist Hospital for emergency surgery. [Id.].

Defendants have clarified that the May 2010 surgery Plaintiffs allege occurred as a result of Coumadin overdose was a bedside procedure, a wound debridement, during which Dr. Faresi "removed necrotic tissue off the wound" and "packed the wound using dry gauze." [Record No. 52-3, at 89:21-22]. Defendants have also provided a copy of a physician's order whereby Dr. Faresi instructed nurses to stop giving Mrs. Bryant Coumadin on May 30, 2010, after she had reported to the hospital complaining of a bleeding wound the day before.[Record No. 54-6].  Defendants have also provided the Court with medical records indicating that Mrs. Bryant has taken Coumadin since at least 2002 for an atrial fibrillation [Record No. 54-4], as well as Mrs. Bryant's prescription record, which indicates the drug was prescribed in 2009 by Kimberly Anne Tolle.[4] [Record No 54-5]. This

---

[4]The Court has not been presented with evidence as to the employment of Kimberly Anne Tolle or if she is associated with KDMC.

prescription record also indicates Mrs. Bryant had filled a thirty (30) days supply of Coumadin, as prescribed by Tolle, on May 2, 2010, twenty seven (27) days before Mrs. Bryant reported to the to the hospital for treatment of her excessive bleeding. [Id.].[5]

Although the Plaintiffs assert that Dr. Faresi and the KDMC gave Bryant an overdose of coumadin, the record before the Court does not reflect that this occurred. On the contrary, the record reflects that Dr. Faresi discontinued Coumadin on May 30, 2010. [R. 54]. Although in his deposition Dr. Faresi testified that Mrs. Bryant's dosing levels of Coumadin at that time were "out of range," and "was incorrect and her levels were too high," the record does not reflect that he or KDMC somehow deviated from a standard of care. [Record No. 52-3, at 89: 1-4]. In fact, the Plaintiffs offer no particularized set of facts on which the Court rely to find a question of fact regarding a standard of care or a deviation from an accepted standard of care. Applying the standard governing issues of summary judgment, if the record, taken as a whole, cannot lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial, and summary judgment is appropriate. Matsushita, 475 U.S. at 586-87. Notably, the trial court is not required to "search the entire record to establish that it is bereft of a genuine issue of material fact." Street, 886 F.2d at 1479-80. "The nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." In re Morris, 260 F.3d 654, 665 (6th Cir. 2001). In this case, the Plaintiffs have failed to meet their burden.

Accordingly, the Defendants are entitled to summary judgment on claim V.

---

[5] The Defendants note that Warfarin, the drug listed in Defendants Prescription Record Exhibit [Record No. 54-5] is the generic for Coumadin.

<u>CONCLUSION</u>

Plaintiffs have not carried their burden of showing that a question of fact exists regarding the elements of negligence, and a jury could not return a verdict in their favor. Accordingly, and for the reasons set forth above, the Court ORDERS THAT:

(1)   Defendants' Motion for Summary Judgment [R. 51] is GRANTED.

(2)   The Court will enter an appropriate judgment..

(3)   This matter be STRICKEN from the Court's docket.

Signed January 17, 2013.



Signed By:
Edward B. Atkins
United States Magistrate Judge